IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Anthony Anderson, ) | |
| ) | Civil Action No. 7:09-2574-JMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Ziehm Imaging, Inc. a/k/a Ziehm ) | |
| Imaging, GmbH, d/b/a Ziehm Academy, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment (doc. 50).  The plaintiff alleges four causes of action against the defendant, his former employer:  race discrimination and retaliation in violation of 42 U.S.C. § 1981 and state law claims for breach of contract and tortious interference with contract.  The defendant alleges several counterclaims against the plaintiff, including breach of contract regarding the plaintiff's failure to repay a $30,000 loan.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTS PRESENTED**

The plaintiff is an African-American male who was employed by the defendant from 2005 through October 31, 2009.  The defendant sells and services mobile x-ray imaging equipment, commonly known as C-Arms.  Prior to his employment with the defendant, the plaintiff was the Chief Radiologic Technologist at Swedish Medical Center, a hospital in Seattle, Washington, for 17 years (pl. aff. ¶3).

In 2000, the plaintiff published "The Radiologic Technologist's Handbook of Surgical Procedures" through CRC Press (pl. resp. m.s.j., ex. 1-1).  As a result of his

contract with CRC Press, he was to receive certain royalties from CRC Press on the sale, reproduction, and/or use of his work (*id.*, ex. 2).  Just prior to the "Introduction" section of the book is a notice to all that he is the author and CRC is the publisher.  Specifically, the notice states that "Neither this book nor any part may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, microfilming, and recording, or by any information storage or retrieval system, without prior permission in writing from the publisher." It further states that "[s]pecific permission must be obtained in writing from CRC Press LLC for such copying" (*id.*, ex. 1-2).

The plaintiff was hired by the defendant as its Product Manager in the summer of 2005.  The plaintiff alleges that in or about January 2005, the defendant took portions of his published work from "The Radiologic Technologist's Handbook of Surgical Procedures" and incorporated it into a "Ziehm Product Training Manual 1, Orthopedic Applications" purportedly under a German copyright for Ziehm Imaging GbmH.  Specifically, the plaintiff claims the defendant copied numerous items directly from his book to their manual without even so much as an attribution (pl. dep.112-14).  Thereafter, the defendant placed this manual on its website where anyone could access it (*id.*115-16).  The plaintiff did not discover this until late 2008-early 2009 (*id.* 116).  Neither the plaintiff nor his publisher consented to its use or reproduction (the plaintiff did not become an employee of the defendant until over six months later) (*id.* 107-108).

In 2007, the defendant asked the plaintiff to relocate from Seattle, Washington, to Spartanburg, South Carolina, to start up the Ziehm Academy because it was crucial to the support of the defendant's national sales organization (Delton Hyatt aff. ¶5).  During this same time, the defendant offered the plaintiff a "bridge loan" to help offset the financial burden of his move. The defendant's former Chief Executive Officer, Delton Hyatt, explained the reasoning as follows:

> Our approach to employee relocation was that an employee
> should be neither unduly rewarded nor financially penalized

2

> strictly for moving to help support the company. Due to developing economic situation at that time, it was the actual but unforeseen situation that his house was unable to sell despite his active efforts and the hiring of a professional Real Estate agent to appraise and sell the property. In light of this, Anthony was given a bridge loan so he could cover his mortgage in Seattle and the new mortgage here. Our management staff at the time thought this was fair because if the company asked him to move, it shouldn't cost him to move.

(*Id.* ¶5).

Thereafter, the plaintiff was tasked to get the United States Ziehm Academy started in Spartanburg, South Carolina. The plaintiff had the project up and running quickly, and it was close to becoming fully self-sustaining by the end of in late 2008 (*id*. ¶6). According to Mr. Hyatt,

> [By] the end of 2008, the organizational "heavy lifting" of the startup was nearly done and Anthony should have been ready to transition in the Spring of 2009 into an executive sales role. That position was also to oversee the Ziehm Academy operations, but not to run it day to day. The position discussed with Anthony would include a base salary and commission structure equivalent to a Regional Sales Manager - a set percentage based on a set compensation commission plan used for all Regional Managers based on the piece of equipment sold, a demo done, or a direct sale. Ziehm has a specific formula for its regional managers that applies equally to all regional managers. Anthony had a reputation in the community that no other sales person had.

(*Id.*). According to Mr. Hyatt, the plaintiff actively supported sales in the Southeast Region even though he did not have a specific sales title (*id.*). During that time, the Southeast Region went from being one of the worst sales regions in 2007 to one of the most successful regions by the end of 2008, directly due to the plaintiff's sales efforts (*id.*). Mr. Hyatt testified that "it was envisioned" that the plaintiff would transition into a sales role, and another employee would take over the administrative role of Ziehm Academy. The plaintiff would then act as the Regional Sales Manager for the Southeast Region and would also manage/oversee the relationship between the defendant and Steadman Hawkins to support

3

Steadman Hawkins in their research and studies (*id.*). Mr. Hyatt testified that the defendant specifically left the Southeast Regional Manager position open and did not replace the former Regional Manager, Charlie Hoes, when he departed in 2007 because the defendant planned for the plaintiff to transition into that role once the Ziehm Academy was up and running in or about the spring of 2009 (*id.*). This strategy was openly discussed with and understood by the Human Resources Director as well as the Chief Financial Officer (*id.*). This was also the plaintiff's understanding (pl. aff. ¶10).

The plaintiff contends that after Mr. Hyatt ended his employment with the defendant, Ken Smith, the National Sales Manager, began inserting himself in the process of determining how and at what amount the plaintiff would receive commissions for sales (*id.*). Scott Byrne, then a Regional Sales Manager for the defendant, told the plaintiff in May 2008 that Mr. Smith had called an African-American female employee a "nigger cunt" (*id.* ¶11; Scott Byrne aff. ¶5). Mr. Byrne reported the remark to the defendant's Human Resources Director, Andrew Boyd, but Mr. Boyd did not notify Mr. Smith's direct supervisor, Mr. Hyatt, who was the CEO at the time, of the complaint (*id.*; Hyatt aff. ¶11). Instead, the CEO found out "through the grapevine" (Hyatt aff. ¶11).

In November 2008, the plaintiff was asked to fly to Riverside, California, for a discussion with Mr. Smith and Nelson Mendes, who was the defendant's new Chief Executive Officer ("CEO"). During this meeting, the plaintiff was asked to put together a sales team for high-end sales, which the plaintiff was supposed to head. The plaintiff named three employees, all of whom he had trained and had previously supervised. According to the plaintiff, he was promised at that meeting that his role would change to reflect a national sales role in high-end products (pl. aff. ¶ 12). In April 2009, Mr. Smith sent an email announcing that the plaintiff "will be heading up the 3D Sales program." In a later email to the Human Resources Director, Mr. Smith clarified that the plaintiff would assume responsibility for 3D Sales "within his current role as Ziehm Academy Manager." Mr. Smith

4

stated in the email that he had asked the plaintiff "to put in writing what he feels his responsibilities should be, and then we could look at them and incorporate what we felt was pertinent into his job description" (def. reply ex. 6).

The plaintiff claims that on January 1, 2009, the three team members he had proposed were promoted to the positions of Account Managers and were given territories and commission structures. However, the plaintiff was not provided a commission structure. The plaintiff claims that when he had discussed the matter previously with Mr. Hyatt, he understood his commission structure "would be akin to a Regional Sales Manager, but after wrangling back and forth with Ken Smith, I was told to propose a percentage and that the role would be national, high-end sales and the Ziehm Academy." The plaintiff claims that Mr. Smith told him to change his job description to reflect his sales role and Mr. Smith would work on the compensation package. According to the plaintiff, his questions about the situation went unanswered for six months, and in the late spring of 2009, he was informed that there was no compensation available for his new role. The plaintiff contacted Human Resources "to express [his] concerns about these matters." In the summer of 2009, the plaintiff was notified by Human Resources that his job description was changed to reflect a sales responsibility without compensation or title. The plaintiff complained via phone and email concerning "the lack of a realistic chance to meet these new goals in addition to the unfairness of the lack of commissioned compensation for the sales role when all other sales staff (non African-Americans) were all getting commissions from sales" (pl. aff. ¶¶ 13-15). The plaintiff claims that after he made these complaints, the budget for the Ziehm Academy was decreased from $250,000.00 to $15,000.00, and it was impossible to meet the Academy's goals with that budget (*id.* ¶16).

John Galando, who was previously the defendant's Vice President of Sales and Vice President of Business Development, testified that on several occasions he recommended the plaintiff for a sales position as either a Sales Manager or Sales Specialist

position (Galando aff. ¶ 2). Mr. Galando testified that the plaintiff met all the qualities necessary to be a Sales Manager or Sales Specialist, and he had personally witnessed the plaintiff make numerous sales calls and presentations for every Regional Sales Manager. He testified he "was quite surprised when the application people Anthony had hired and reported directly to Anthony were promoted to sales positions with no sales presentation or sales experience" (*id.* ¶4).

Mr. Byrne, a former Regional Sales Manager for the defendant, testified in his affidavit that he was "surprised" when the plaintiff "was passed up when Ziehm added clinical sales representatives. In fact, the three reps Ziehm promoted were all trained by Anthony Anderson" (Byrne aff. ¶2). He further testified that he believed that the plaintiff not being given a sales position was racially motivated and cited the instance when he heard Mr. Smith call an African-American female employee a racist and derogatory name (*id.* ¶¶3, 5-6).

Brian Collins, a former Regional Sales Manager for the defendant, testified that the plaintiff's efforts directly led to many of his sales. While Mr. Collins received commissions on these sales, the plaintiff did not (Collins aff. ¶3). Mr. Collins recommended that the plaintiff "be given a national sales role and was repeatedly assured by key Ziehm personnel (including Ziehm's Vice President, Ken Smith) that Anthony was going to be titled the 'Sales Specialist' and compensated with commissions based upon his sales. By far, Anthony is the most talented individual Ziehm had in regard to product knowledge, sales and technical support" (*id.*¶4).

With regard to the terms of the sales role he claims was promised, the plaintiff testified as follows:

> Q. [W]hen you were meeting with [Ken Smith and Nelson Mendes] . . . [w]ere you all trying to come to terms of an agreement about how you would proceed in this new role?
>
> A. Yes.

6

>    Q. And were these ongoing discussions?
>
>    A. No.
>
>    Q. So at any time during these conversations did they give you the salary and the offer of a new position?
>
>    A. No.

(Pl. dep. 60-61).  Later in his deposition, the plaintiff further testified to the timetable of the discussions regarding his new sales role.  The plaintiff testified that the discussions went on for months until he was told there was no budget to pay him for the new position (pl. dep. 160-64).  The plaintiff testified as follows:

>    Q. So it would be fair to say that you never reached the terms of your agreement for this new position?
>
>    A. I would say yes, ma'am.

(Pl. dep. 164).

Mr. Mendes, who became the defendant's CEO in November 2008, testified that he met with the plaintiff two or three times over a period of several months in an attempt to work something out, but they were never able to reach an agreement as to the plaintiff's job duties, salary, or commission in a new sales position.  Early in the discussions in December 2008, Mr. Mendes proposed a sales position that required a sales quota, but the plaintiff told Mr. Mendes he did not wish to be subject to strict quotas like all the other of the defendant's sales employees.  He wished to continue earning his salary along with a commission for every C-Arm sale made by dealers or agents and supported by him.  Mr. Mendes testified no such job with the defendant met that description, but he was willing to attempt to create a new job.  However, after months of discussions, they were unable to do so.  Mr. Mendes testified the plaintiff was offered a similar position as other clinical sales specialists, but the plaintiff declined, stating he would not submit to quotas and targets, and he did not want to leave his current responsibilities at Ziehm Academy.  A special sales

position was also considered wherein the plaintiff would be responsible for supporting high-end equipment sales, performing demos, and customer contacts, but the plaintiff also declined, claiming he would not perform demos. With regard to the plaintiff's claim that he was already performing job duties of a sales position with regard to the 3D program, Mr. Mendes testified that the plaintiff job duties as educator and manager of Ziehm Academy required him to perform demonstrations of any product the defendant sold, to include the 3D program. Mr. Mendes stated that these demonstrations were part of the plaintiff's duties since 2007 and were not part of some new job duties in a sales position (Mendes aff. ¶¶ 4-5).

The plaintiff claims that a document containing his biography with a picture of a Caucasian male beside it was created without his input and posted on the world wide web (pl. aff. ¶ 28). In his response in opposition to the motion for summary judgment, the plaintiff references an Exhibit 10 in support of his assertion that the advertising material was posted on the world wide web (pl. resp. m.s.j. 16). However, no Exhibit 10 has been filed by the plaintiff with the court. Mr. Hyatt recalls seeing the document containing the plaintiff's biography alongside the photograph of a Caucasian male on the world wide web on the Ziehm GmbH website (Hyatt aff. ¶ 12).

The defendant's former Vice President for Strategy, Product Management, Marketing and New Business Development in Germany, Manuela Mueller-Gerndt, testified in her affidavit that the document at issue was a biography page for the Ziehm Academy trainers in the United States and Germany. The document was under construction, and Ms. Mueller-Gerndt testified that the plaintiff was asked repeatedly to provide a photograph, but he failed to do so. Ms. Mueller-Gerndt remembers that she "became quite angry with his failure to respond to us and had to act with SEVERAL escalation calls." Thus, the document was sent in draft form to the plaintiff for his review. The photograph placed beside the plaintiff's biography was a "dummy" photograph meant for the plaintiff to replace. According

8

to Ms. Mueller-Gerndt, the document was never finalized as the plaintiff never responded to their requests (Mueller-Gerndt aff. ¶¶ 4-8).

Stephanie Hodder, a freelancer who consults with the defendant in Germany as its Training Manager, also testified that Ms. Mueller-Gerndt sent the plaintiff a template document including the "dummy" photograph and asked the plaintiff to edit the draft biography and provide a photograph. Ms. Hodder remembers the plaintiff "grumbling" at that time because he did not want his information to be used. She had to continue to remind the plaintiff to provide a photograph, and she does not recall that he ever sent a photograph. Ms. Hodder testified that the defendant never published the information on their website, and if it was published on the United States Ziehm Academy website, it would have been published by the plaintiff himself since he administered that site (Hodder aff. ¶¶1-7). On November 18, 2008, the plaintiff forwarded the document to another employee, joking about the "amazing effects of moving to South Carolina has had on [him]" (def. reply, ex. 12).

## APPLICABLE LAW

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

## ANALYSIS

### *Section 1981 Race Discrimination*

In his complaint, the plaintiff alleges the defendant refused to move him into a sales position because of his race and also that he "was told that…(the defendant's) VP

of Sales used a racially charged slur…and that the reason (he) was not being chosen was as a result of racial animus" (comp. ¶¶17,19-27). The defendant contends that it could never come to terms with the plaintiff for a sales position.

"To prevail on a disparate treatment claim for failure to promote, [the plaintiff] must establish that [he] was treated less favorably because of [his] race." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005) (citations omitted). Under the burden-shifting method of proof of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), if the plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981) (this is a burden of production, not persuasion). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). To prove a *prima facie* case of discriminatory failure to promote, the plaintiff must prove that: (1) he is a member of a protected class; (2) he applied for the position in question; (3) he was qualified for that position; and (4) the defendant rejected his application under circumstances that give rise to an inference of unlawful discrimination. *Anderson*, 406 F.3d at 268.

The plaintiff alleges that he has been treated disparately in the terms and conditions of his employment since 2005. He was hired in July 2005, and he alleges that in or about October 2005 he began experiencing instances of racial discrimination (comp. ¶10). The plaintiff filed his complaint on October 1, 2009. The defendant first argues that "[a]s to any complaints of not being promoted to sales positions in 2005 and 2006, such claims are barred by the applicable three-year limitations period . . . " (def. m.s.j. 13 n.84). However, as pointed out by the plaintiff, in *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004), the Supreme Court considered whether the former employees' claims, arising under the 1991 amendment to 42 U.S.C. § 1981 for hostile work environment, wrongful

11

termination, and failure to transfer, were governed by the four-year statute of limitations set forth in 28 U.S.C. § 1658(a). The Supreme Court found that the claims did arise under the amended statute as "they were made possible by that Act," and thus they were subject to the four year statute of limitations. 541 U.S. at 383-84. The defendant did not address this issue and case in its reply brief. Based upon the foregoing, the defendant's statute of limitations argument is without merit.

The plaintiff attempts to show an inference of discrimination based upon a racist comment made by Mr. Smith about an African-American female employee.

> A court may also consider stray comments that provide circumstantial evidence of discriminatory animus, in combination with other evidence. *See Warren v. Fort Lincoln Cemetery, Inc.*, No. 00-419, 2001 WL 743199 (D. Md. June 26, 2001) (holding though employer's racial slurs were not direct evidence of discriminatory intent, the employer's "conduct may still support Plaintiff's case as circumstantial evidence of discriminatory animus" by employer). The Court may weigh these stray comments in deciding whether a discriminatory animus is the most likely explanation for a plaintiff's termination. *See Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir.2001) ("[T]hough such 'stray remarks' may be material to the pretext inquiry, 'their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or ... were not related to the employment decision in question, or were made by nondecisionmakers.' ").

*Huang v. Gutierrez*, C.A. No. AW-08-2882, 2010 WL 93274, at *10 (D. Md. January 5, 2010) (slip copy). Here, the remark, while made by a decisionmaker, was not related in any way to the plaintiff or the decision to not give him a sales position. Furthermore, there is no evidence that the comment was temporally close to any decision regarding the plaintiff moving into a sales role (pl. aff. ¶11). Accordingly, the "probativeness" of the comment is "circumscribed." The plaintiff testified in his affidavit that he "frequently overheard comments with racial overtones from Ken Smith . . . while in my presence to other personnel" (*id.* ¶27); however, he cited no specific examples of such comments. Thus, it

12

is impossible for the court to weigh such comments in deciding whether a discriminatory animus has been shown.

The plaintiff has no "other evidence" of discriminatory animus. *See Huang*, 2010 WL 93274, at *10. The plaintiff argues that the defendant's animus toward African-Americans is further shown because the defendant "asserted Plaintiff was a Caucasian in advertising material it put on the world wide web" (pl. resp. m.s.j. 15). However, viewing the evidence in light most favorable to the plaintiff, there is absolutely *no* indication that the picture of the Caucasian man placed beside the plaintiff's biography was anything other than a "dummy" photograph meant to be edited by the plaintiff (Mueller-Gerndt aff. ¶¶ 4-8; Hodder aff. ¶¶1-7). The plaintiff has failed to show evidence the incident was in any way racially motivated.

Based upon the foregoing, assuming the plaintiff can establish a *prima facie* case of race discrimination, he cannot show that defendant's decision regarding his sales role was pretext for discrimination. Accordingly, summary judgment should be granted on this claim.

***Retaliation***

The plaintiff alleges he contacted Human Resources to complain when he was told there was no budget to compensate him for his sales role (pl. aff. ¶¶ 14-15). He claims that thereafter the defendant "significantly slashed the Ziehm Academy budget to a point that it was impossible to meet the Ziehm Academy goals" (*id.* ¶16).[1] The plaintiff further contends that after he "retained counsel and tried to negotiate the situation, Defendant began threatening that Plaintiff committed insubordination in connection with his job duties" (pl. resp. m.s.j. 7).

---

[1] The plaintiff was terminated from employment by the defendant on October 31, 2010. He does not allege a claim for retaliatory termination in this lawsuit (pl. resp. m.s.j. 7 n.2).

13

Section 1981 encompasses claims of retaliation. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008). To establish a *prima facie* case of retaliation under Title VII or Section 1981, the plaintiff must prove: 1) he engaged in a protected act; 2) an adverse employment action was taken against him; and 3) there is a causal connection between the protected act and the adverse employment action. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998); *Bryant v. Aiken Regional Medical Centers Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). The adverse action need not be an ultimate employment decision, but must be "materially adverse," meaning "'it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Prince-Garrison v. Maryland Dep't of Health & Mental Hygiene*, 317 Fed. Appx. 351, 354 (4th Cir.2009) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The standard for demonstrating a materially adverse employment action is less stringent for a retaliation claim than it is for a substantive discrimination claim. *See Burlington*, 548 U.S. at 67. Nevertheless, a plaintiff is still required to demonstrate actual harm or injury caused by the retaliatory conduct. *Id.*

The plaintiff has failed to show that the above-cited actions constitute adverse employment actions. In his response in opposition to the motion for summary judgment, the plaintiff claims that after complaining about his treatment he was "threatened with insubordination, though the threat to Plaintiff was routed through his counsel" (pl. resp. m.s.j. 17). The plaintiff cites his deposition in support of this claim (*id.*). However, in his deposition, the plaintiff responded "no" when asked if anyone ever discussed insubordination with him (pl. dep. 66-67). No other evidence regarding this claim is cited. This court finds that, even assuming such a threat was made, it does not rise to the level of a materially adverse employment action. *See Karges v. Charleston County Sheriff's Office*, C.A. No. 2:08-2163-MBS-RSC, 2010 WL 1303433, at *8 (D.S.C. March 5, 2010)

(finding that disciplinary actions and supervisor's "threat" to fire the plaintiff did not rise to level of a materially adverse employment action in a retaliation claim).

The plaintiff also contends that in retaliation for his complaints the budget of the Ziehm Academy was decreased from $250,000 to $15,000, but the goals for the Academy remained the same, making it impossible for the Academy to reach its goals (pl. aff. ¶32). It is undisputed that the defendant has experienced financial difficulty over the past few years, and in 2009 and 2010 it reduced its workforce by 29 employees (Hill aff. ¶11). As argued by the defendant, courts in the Fourth Circuit have found that negative performance evaluations, changes in work schedule, reprimands, warnings, and counseling are, alone, insufficient to constitute materially adverse employment actions (*see* def. m.s.j. 17 n. 87 (citing cases)). If these sorts of actions are not considered materially adverse, it is difficult to see how a decrease in budget, especially in a year of poor performance by a company, can be considered materially adverse. Furthermore, beyond his conclusory allegations of temporal proximity, the plaintiff has offered no evidence of a connection between the budget decrease and his complaints. Based upon the foregoing, the retaliation claim should be dismissed.

### *Breach of Contract*

"[E]xpressions of hope, belief, or opinion; preliminary negotiations; and agreements to agree do not amount to a contract in South Carolina." *Blanton Enterprises, Inc. v. Burger King Corp.*, 680 F. Supp. 753, 770 n.20 (D.S.C. 1988). "'It is well-settled in South Carolina that in order for there to be a binding contract between the parties, there must be a mutual manifestation of assent to the terms…the assent must be as to all of the terms of contract.'" *Id.* (quoting *Edens v. Laurel Hill, Inc.*, 247 S.E.2d 434, 436 (S.C. 1978).

In *Cox v. Handcrafted Homes, LLC.*, C.A. No. 3:09-2811-JFA, 2010 WL 2079724, at *3 (D.S.C. May 24, 2010), the South Carolina District Court granted summary

judgment against the plaintiff/employee who contended that he had an employment agreement with the defendant/employer, finding that the plaintiff failed to demonstrate there was a genuine issue of material fact as to whether the plaintiff had a contract for a definite term.  Although the plaintiff in *Cox* proved a salary amount was agreed upon, he could not establish that it was guaranteed for any period of time.  *Id.* at *4 .  In so holding, the court noted, "'[g]eneral contract law provides that a 'contract exists when there is an agreement between two or more persons upon sufficient consideration either to do or not to do a particular act.'"  *Id.* at *3 (quoting *Prescott v. Farmers Tel. Co-op., Inc.*, 516 S.E.2d 923, 925-26 (S.C.1999)).

In *Blanton*, the plaintiff contended it had a binding oral agreement with defendant for a franchise based on representations the plaintiff believed defendant made.  In rejecting plaintiff's allegations that the conversations amounted to a binding contract, the court held, "Assuming that the representations in question were made and could reasonably be construed as promises and not expressions of hope, opinion or belief, the plaintiff has still failed to come forward with evidence of an oral contract sufficiently definite in its terms to be enforceable under South Carolina law."  *Blanton*, 680 F. Supp. at 770.  The court found it significant that the plaintiff admitted "'all of the terms of the franchise agreement were not discussed between plaintiff and defendant," noting that plaintiff's "subjective intent" as to the contract's formation is irrelevant.  *Id.* at 770-71.

Viewing the evidence in a light most favorable to the plaintiff, this court must conclude that the plaintiff "never had an oral agreement sufficiently definite to be enforceable under South Carolina Law."  *Id.* at 770.  As set forth above, the plaintiff admitted in his deposition that he and the defendant never came to terms on the sales position:

> Q.   [W]hen you were meeting with [Ken Smith and Nelson Mendes] . . . [w]ere you all trying to come to terms of an agreement about how you would proceed in this new role?
>
> A.   Yes.

> Q. And were these ongoing discussions?
>
> A. No.
>
> Q. So at any time during these conversations did they give you the salary and the offer of a new position?
>
> A. No.

(Pl. dep. 60-61). The plaintiff testified as follows:

> Q. So it would be fair to say that you never reached the terms of your agreement for this new position?
>
> A. I would say yes, ma'am.

(Pl. dep. 164). Even Mr. Hyatt, the defendant's former CEO who submitted an affidavit in support of the plaintiff, does not testify that specific terms for the sales role "envisioned" for the plaintiff were agreed upon (*see* Hyatt aff.). The evidence before the court is that the defendant and plaintiff discussed, planned, and negotiated for several months regarding the plaintiff's transition into a sales position. However, there was never a mutual manifestation of assent to the terms of such a role for the plaintiff. Based upon the foregoing, the plaintiff's breach of contract cause of action should be dismissed.

### *Tortious Interference with Contract*

In his tortious interference with a contract claim, the plaintiff alleges that he created a written work for which he obtained a copyright before coming to work for the defendant, that he entered into a contract with a publisher for his copyrighted work whereby he would receive royalty payments from the sale of his work, and that the defendant interfered with that contract by reproducing his copyrighted work on the defendant's website in 2004 (comp. ¶¶7, 39-44).

The elements of a cause of action for tortious interference with contract are: (1) existence of a valid, enforceable contract; (2) defendant had knowledge of the contract;

(3) defendants intentionally procured its breach; (4) the absence of justification; and (5) resulting damages. *Blanton*, 680 F.Supp. at 778.

Here, the plaintiff has come forward with evidence showing a contract between himself and CRC Press (pl. resp. m.s.j., ex. 2). Just prior to the "Introduction" section of the book is a notice to all that the plaintiff is the author and CRC is the publisher. Specifically, the notice states that "[n]either this book nor any part may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, microfilming, and recording, or by any information storage or retrieval system, without prior permission in writing from the publisher." It further states that "[s]pecific permission must be obtained in writing from CRC Press LLC for such copying" (*id.*, ex. 1-2).

The defendant does not appear to deny that it reproduced the copyrighted work on its website, nor does the defendant offer a justification for its action. The defendant does argue, however, that the plaintiff cannot prove damages. When the tortious conduct of a defendant causes a plaintiff to lose prospective profits, the plaintiff may recover such profits when he can prove: (1) it is reasonably certain that such profits would have been realized except for the tort; and (2) such lost profits can be ascertained and measured from the evidence produced with reasonable certainty. *Vortex Sports & Entm't, Inc. v. Ware*, 662 S.E.2d 444, 450-51 (S.C. Ct. App. 2008) (citing *Petty v. Weyerhaeuser Co.*, 342 S.E.2d 611, 615 (S.C. Ct. App. 1986)).

The plaintiff argues his lost profits can be ascertained by the number of "hits" the defendant's website got on his material (pl. resp. m.s.j. 18). The defendant argues in response as follows:

> First, Plaintiff has not produced any information in discovery as to the number of hits his publisher's website received and makes this argument for the first time in this litigation. Therefore, Defendant objects to introduction of any such "evidence." Secondly, "hits" on a website can in no circumstances prove how many purchases of products from that website have occurred just as looking at a dress for sale on a

18

> hanger does not mean the shopper bought it. Browsing products on the internet is not the same as purchasing products from the internet, and cannot be the basis for lost prospective profits.

(Def. reply 15). This court agrees.

"It is true, of course, that [the plaintiff] was not required to prove its case at the summary judgment stage, but [the defendant's] motion obligated [the plaintiff] to show evidence that it would produce at trial sufficient to establish that it had been damaged by [the defendant's] conduct." *RGI, Inc. v. Unified Industries, Inc.*, 963 F.2d 658, 661 (4th Cir. 1992) (affirming grant of summary judgment based on plaintiff's failure to raise a genuine issue of material fact with regard to damages on claims including tortious interference with a contract). Here, the plaintiff has submitted absolutely no evidence supporting his claim of lost profits based upon the defendant's alleged tortious interference with his publishing contract. Further, his argument that such lost profits may be ascertained by the number of "hits" on the defendant's website on which his material was posted is speculative, conclusory, and does not demonstrate the "reasonable certainty" needed to prove lost profits. Accordingly, summary judgment should be granted.

### *Counterclaim for Breach of Contract*

The defendant also moves for summary judgment on its breach of contract counterclaim against the plaintiff. The defendant alleges the plaintiff agreed to repay within a year the $30,000 loan it made to him in 2007 (am. answer ¶¶ 82-84). The defendant alleges that $27,500 remains outstanding on the loan (*id.* ¶ 73). The plaintiff does not deny that he owes the defendant the outstanding amount of the loan; however, he testified in his affidavit that "the agreement was it would come out of my commission bonuses and Ziehm prevented me from having any commissions because they broke their promises to put me on commission" (pl. aff. ¶ 35). It appears to this court that issues of material fact remain as

to the terms of the loan agreement. Accordingly, summary judgment should be denied on this claim.

The defendant alleges several other state law counterclaims in its amended answer: breach of contract – secrecy agreement; defamation; tortious interference with existing contractual relations; tortious interference with prospective contractual relations; and breach of duty of good faith and loyalty to employer. Should the district court adopt this court's recommendation that the plaintiff's federal claims (and related state law claims) be dismissed, the court should decline to exercise supplemental jurisdiction over the defendant's counterclaims. 28 U.S.C. § 1367(c); *see United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is recommended that the defendant's motion for summary judgment (doc. 50) be granted as to the plaintiff's claims as set forth above. This court further recommends that the defendant's motion for summary judgment as to its counterclaim for breach of contract be denied.

January 18, 2011  
Greenville, South Carolina

s/Kevin F. McDonald  
United States Magistrate Judge